UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

| | |
|---|---|
| STARKVILLE PRIDE, BAILEY MCDANIEL, and EMILY TURNER, <br><br> *Plaintiffs,* <br><br> v. <br><br> CITY OF STARKVILLE, <br><br> *Defendant.* | CIVIL ACTION NO. 1:18cv032-SA-DAS |

Plaintiffs STARKVILLE PRIDE, BAILEY MCDANIEL, and EMILY TURNER, through their undersigned counsel, bring this suit against Defendant CITY OF STARKVILLE. By this Complaint, Plaintiffs seek injunctive and declaratory relief, costs and attorney's fees, as well as any other relief to which they may be entitled.

## NATURE OF ACTION

1. This case arises from an effort by the City of Starkville to ban people from speaking in a public forum because it disagrees with their ideas and disapproves of their sexual orientation.

2. In July 2017, Plaintiff Starkville Pride and two of its leaders, Plaintiffs Bailey McDaniel and Emily Turner, decided to plan a parade. They wanted to celebrate the local LGBT community and send a message in support of equality and dignity for LGBT persons.

3. Carefully adhering to all guidelines, Plaintiffs submitted a permit application to the City of Starkville.

4. For most people who plan parades in Starkville, this process is straightforward: in virtually every prior instance for which detailed records are publicly available (a total of 88

permit applications from 2010 to 2018), the Board of Aldermen addressed the application without public comment or deliberation through a simple yes-or-no vote. And in every single past instance, the permit application was approved.

5. Plaintiffs' application, on the other hand, was subjected to an irregular procedure that involved a closed-session meeting of the board, followed by public comment and open discussion among the Alderman.

6. Throughout this process, the *only* objections raised against Plaintiffs' parade were anti-LGBT religious comments directed to the parade's LGBT content and the pro-LGBT viewpoint that the parade would express. In other words, nobody raised any concerns related to logistics, security, or cost.

7. Nevertheless, the Board voted four-to-three to deny Plaintiffs' permit application. As a result, Plaintiffs do not have the requisite permit to hold their parade on March 24, 2018, as planned.

8. Defendant's denial of Plaintiffs' permit application constitutes impermissible viewpoint and content discrimination in violation of the First Amendment to the United States Constitution.

9. In addition, the City's discriminatory treatment of Plaintiffs—based solely on animus toward LGBT persons and groups that support their equal dignity violated Plaintiffs' right to the equal protection of the law pursuant to the Fourteenth Amendment.

## **JURISDICTION AND VENUE**

10. Plaintiffs bring this action pursuant to 42 U.S.C. §1983 for violations of the First and Fourteenth Amendments to the United States Constitution.

11. This case arises under the United States Constitution and the laws of the United States. The case presents a federal question within this Court's subject-matter jurisdiction under Article III of the Constitution and 28 U.S.C. §1331.

12. The Court has jurisdiction to declare the rights of the parties and to award any further necessary and proper relief pursuant to 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. §§ 1983 and 1988, and Fed. R. Civ. P. 65. The Court has authority to award costs and attorney's fees under 42 U.S.C. § 1988.

13. Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in Starkville, Mississippi, which is within the Northern District of Mississippi, Eastern Division.

## PARTIES

14. Plaintiff Starkville Pride is, and was at all relevant times to the Complaint, a grassroots community organization of approximately 77 individuals who share a commitment to equality and dignity for LGBT persons. The organization's members communicate with one another through group email lists and the online platform GroupMe, in addition to hosting regular, in-person meetings.

15. Plaintiff Bailey McDaniel is, and was at all relevant times to the Complaint, a resident of Starkville, Mississippi and a student at Mississippi State University. Ms. McDaniel identifies as a Lesbian.

16. Plaintiff Emily Turner is, and was at all relevant times to the Complaint, a resident of Starkville, Mississippi and a student at Mississippi State University. Ms. Turner identifies as a Lesbian.

17. Defendant City of Starkville is, and was at all relevant times to the Complaint, a municipality located in the Northern District of Mississippi, Eastern Division.

## FACTS GIVING RISE TO THIS ACTION

18. In July 2017, Plaintiffs began organizing the first ever Starkville Pride parade, to be held on March 24, 2018 (the "Parade"). The purpose of the Parade was to celebrate the LGBT community and to send a message in support of equality and dignity for LGBT persons.

19. Starkville Pride raised nearly $7,000 to put on the Parade. Plaintiffs spent considerable time and energy coordinating the Parade—and associated events—with local businesses, vendors, and community members. Plaintiffs also spent money printing promotional materials, many of which noted that the Parade would occur in Starkville on March 24, 2018.

20. In the City of Starkville, organizers of special events—including parades—are required to submit a "Special Event Application" to the City Building Department. Applications are reviewed by a Special Event Committee (the "Committee"), which then submits the applications to the Board of Aldermen ("The Board"). Acting on behalf of the City, the Board has the ultimate authority to approve or deny an application.

21. On information and belief, special events applications typically are considered through a straightforward process that does not involve public comment or deliberation and provides for an up-or-down vote.

22. Detailed public records are available for a total of 88 applications from 2010 until February 2018. Those records indicate that 80 of those applications were considered as part of the Board's "consent agenda" or otherwise were decided through an up-or-down vote with no public comment or deliberation whatsoever. Indeed, only two applications prior to Starkville Pride's Application involved any substantive public comment or deliberation—those

4

applications were decided in 2011 and 2012, respectively, and the comments and deliberation were exclusively logistical in nature.

23. On information and belief, properly submitted special events applications are routinely granted. Publicly available records indicate that, since 2010, every special events application considered by the Board (other than Starkville Pride's) has been granted.

24. On behalf of Starkville Pride, Plaintiff Turner completed the Starkville Pride Special Events Application for the Parade.

25. The Application included a substantial amount of information. For example, it stated that the event would include an art market in addition to the Parade; that the event would be open to the public; and that the organizers expected 200 participants and 200 spectators. The Application also included a list of community sponsors and beneficiaries, as well as a list of references.

26. The Application outlined an event that was similar in material respects to events that have routinely been approved by the Board in the past. In their Application, Plaintiffs stated that their event would take place on Saturday, March 24, with the art market beginning at 8:00 am, the Parade commencing at 12:00 pm, and a teardown time of 5:00 pm. Plaintiffs requested certain street closures in connection with the Parade and estimated a total cost to the City of $3,220.

27. Materially similar events have routinely been approved in the past. In September 2017, for example, the Board approved an application for the 2017 Starkville Community Day, hosted by "MaddMothers Against Domestic Disputes." That event also took place on a Saturday, ran from 8:00 am until 11:30 pm, required street closures for a walk (along a route similar to the route planned for the Parade), and estimated a total cost to the City of $4,677.50.

5

28. Similarly, in October 2016, the Board approved the Frostbite Half Marathon, which also took place on a Saturday, involved even more extensive street closures, and estimated a cost to the City of $2,750.

29. In preparing the Application, Turner received assistance from a Starkville city official who wishes to remain anonymous out of concern for his job. This individual candidly advised her and McDaniel that they should try to keep LGBT related-content on the Application "under the radar" if they wanted Board approval. McDaniel and Turner understand that this individual would like to remain anonymous, and prefer not to identify him by name or position—not because he did anything wrong, but in order to avoid any negative repercussions he may suffer for having helped Plaintiffs. This official also helped Plaintiffs ensure that the Application was completed correctly and had no defects.

30. On February 6, 2018, Plaintiffs met with the Special Events Committee. At that meeting, the Committee informed Plaintiffs that their Application was proper and that the Committee was transmitting that Application to the Board.

31. On February 16, the Board of Alderman held a public meeting to determine which agenda items would be placed on the consent agenda at its February 20 meeting. Consistent with its virtually unbroken practice with respect to special event applications, the Board placed Starkville Pride's Application on the consent agenda.

32. When the Board met on February 20, however, Mayor Lynn Spruill asked the Aldermen to approve the consent agenda. In the first of several irregular developments at this meeting, Vice Mayor Roy Perkins—who also serves as an Alderman—objected. As a result, Starkville Pride's Application was pulled from the consent agenda. Compounding the irregularity, Alderman Sandra Sistrunk then moved for the Aldermen to excuse the public and hold a secret, closed-door

"executive session." Plaintiffs and other community members were required to leave the room and wait outside for approximately ten minutes. When the public was invited back into the meeting, the Mayor stated that no formal action had been taken during the executive session, although it is not clear what informal decisions might have been reached.

33. After addressing several unrelated issues, the Board invited members of the community to make public comments concerning the Application. McDaniel told the Aldermen that it is "time for Starkville to recognize the [LGBT] community," and that "Starkville Pride is going to be a wonderful celebration of community, inclusion and diversity for years to come."

34. When she rose to speak, Turner noted economic and other respects in which the Parade would benefit the community. She also emphasized that the Parade would express an important message: "Starkville is an inclusive place, which I know it is."

35. In addition to these remarks from McDaniel and Turner, fourteen other individuals—including students, business owners, and state officials—spoke in support of the parade. Their comments demonstrate that the Parade was understood as an expressive event, and that many people in Starkville believed it would confer substantial benefits on their community.

36. As these men and women explained why the Application should be approved, the four Aldermen who would subsequently vote against the Application remained silent and pointedly avoided eye contact with them.

37. Only two people spoke in opposition to the Parade—and both of them voiced objections based solely on the content and viewpoint of the message to be expressed by the Parade. The first objector was Dorothy Isaac. Ms. Isaac told the Board, "if anything [is] to be hailed up and down our street it should not be this. God made Adam and Eve." She then appealed to the Alderman, "[P]lease do not turn our city into a city of sin . . . I really, really will hope y'all will put this

down quickly." These remarks were consistent with a conversation between Ms. Isaac and the Vice Mayor just before the meeting began, in which the Vice Mayor said to Ms. Isaac, "thank you for being here, I know you know the true issues."

38. The second person to speak against the Parade was Pastor Thomas Rogers. He said that Starkville is a "very friendly city, very friendly county and we have done a lot of things to adjust for the university . . . [b]ut every city has to have a limit or limits and cities without walls are easily taken. . . .do what is true and act [] against the Pride march or Pride parade."

39. Neither Ms. Isaac nor Pastor Rogers voiced any logistical, security-related, financial, or other objection to the Parade. Nor did they state that the Application was flawed under the City's permit requirements. In fact, no one at the meeting raised any concern along these lines whatsoever.

40. Following public comments, the Vice Mayor made a motion to deny the Application. Alderman Carver seconded the motion. In response, Alderman Walker requested confirmation that the Application had been completed in full, was free of defects or errors, and met all applicable requirements. A Community Development official confirmed each of these points, and no Alderman indicated any disagreement. Alderman Walker then asked the Community Development official whether a proper application, like this one, had *ever* been denied. The Community Development official responded that he had been there since 2014 and had "not seen anything like that."

41. The Mayor then said that she had spoken to the Mayor of Oxford, Mississippi, who reported that Oxford had held a pride parade that had been "no different or separate from any other parade they have had." The Mayor said that she hoped that the Board would approve the Application and authorize the Parade, which she did not "expect to be anything other than what

any other parade is in town, which is an opportunity for people to come downtown and be a part of a group." In the same vein, Alderman Miller encouraged the Board to consider the public relations and economic implications of denying the Application. Alderman Miller also spoke directly to community members who had made comments concerning the Application, telling them, "you're all welcome in Starkville" and "you are important to Starkville."

42. Again, at no point during this discussion did any Alderman raise any logistical, security-related, financial, or other concern relating to the Parade. Indeed, none of the Aldermen who ultimately voted against the Application uttered a single word during this discussion.

43. Following this exchange, Aldermen Carver, Little, and Vaughn, and Vice Mayor Perkins each voted to grant the Vice Mayor's motion to deny the Application. By a vote of four to three, the motion to deny the Application passed.

44. McDaniel burst into tears. The four Aldermen who voted to deny the Application promptly left the room through a private back entrance.

45. McDaniel and Turner were deeply hurt by the Board's unexpected decision to forbid the Parade. They had worked hard to plan a celebration of their identities and their message of equal dignity—and suddenly their plans had been rejected, indeed censored, by leaders of the community they call home. In addition, McDaniel and Turner felt ashamed and stigmatized. They had been singled out for unfavorable treatment because they identify as lesbians and because the organization they led was associated the LGBT community. Recognizing McDaniel's visible pain, Mayor Spruill said, "I am so sorry."

46. In the days following the vote, former Alderman Lisa Wynn used Twitter to thank the four Alderman who voted against the Application for "saying NAY…NO PARADE!"

47. Ms. Wynn added, "I warned my friends this would occur under LESBIAN leadership."

48. The next day, Ms. Wynn tweeted again. This time she took credit for identifying LGBT-related content in the Application, and for successfully lobbying the Board to suppress that content: "I tipped the Aldermen off about the language…PRIDE. Secured the 4 votes this weekend. I'm still working it."

49. As of the date of this filing (other than the tweets discussed above by a former Alderman), none of the four current Aldermen who voted to deny the Application has publicly offered any explanation or justification for his or her vote.

## FIRST CLAIM FOR RELIEF
### (First Amendment – 42 U.S.C. §1983)

50. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

51. Defendant's denial of Plaintiffs' Application violated and continues to violate Plaintiffs' rights to freedom of speech, assembly, and petition guaranteed by the First Amendment of the United States Constitution, as applied to the states by the Fourteenth Amendment.

52. Defendant's denial of Plaintiffs' Application was based on their viewpoint and the content of the speech at issue. The denial was not necessary to achieve any compelling government interest.

53. Plaintiffs have a cause of action for violation of their constitutional rights to freedom of speech, under the Civil Rights Act, 42 U.S.C. §1983.

## SECOND CLAIM FOR RELIEF
### (Equal Protection – 42 U.S.C. § 1983)

54. Plaintiffs reallege and incorporate by reference all of the preceding paragraphs in this Complaint.

55. Defendant's denial of Plaintiffs' Application has violated and continues to violate Plaintiffs' rights to equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution.

56. Defendants' denial of Plaintiffs' Application was based on discrimination against Plaintiffs on the basis of sexual orientation.

57. Plaintiffs have a cause of action for violation of their constitutional right to equal protection, under the Civil Rights Act, 42 U.S.C. § 1983.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully prays for the following relief:

(i) A judgment declaring that Defendant's denial of Plaintiffs' Application violates the First and Fourteenth Amendments to the United States Constitution;

(ii) Injunctive relief requiring the City of Starkville to grant Plaintiffs' Application, or to otherwise permit the Parade to go forward as planned;

(iii) Reasonable attorneys' fees and costs; and

(iv) Any other relief to which Plaintiffs may be entitled.

Dated: February 26, 2018

Respectfully submitted,

*/s/Alysson Mills*
Alysson Mills, MS Bar No. 102861
Kristen D. Amond, LA Bar No. 37011
FISHMAN HAYGOOD LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170
(504) 586-5253

Roberta A. Kaplan (*pro hac vice pending*)
John C. Quinn (*pro hac vice pending*)
Joshua Matz (*pro hac vice pending*)
KAPLAN & COMPANY, LLP
350 Fifth Ave, Suite 7110
New York, NY 10118
(212) 763-0883
*Attorneys for Plaintiffs*