## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF MISSISSIPPI
## EASTERN DIVISION

STARKVILLE PRIDE, BAILEY MCDANIEL,
and EMILY TURNER,

*Plaintiffs,*

v.

CITY OF STARKVILLE,

*Defendant.*

CIVIL ACTION
NO. 1:18-cv-00032-SA-DAS

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION</u>

Roberta A. Kaplan (*pro hac vice pending*)
John C. Quinn (*pro hac vice pending*)
Joshua Matz (*pro hac vice pending*)
KAPLAN & COMPANY, LLP
350 Fifth Ave, Suite 7110
New York, NY 10118
(212) 763-0883

Alysson Mills, MS Bar No. 102861
Kristen D. Amond, LA Bar No. 37011
FISHMAN HAYGOOD LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA 70170
(504) 586-5253

*Attorneys for Plaintiffs*

February 26, 2018

# **TABLE OF CONTENTS**

BACKGROUND ................................................................................................................ 2

    A.     Starkville Pride and the Planning of the Parade ................................................ 2

    B.     The Starkville Special Events Application Process .............................. 3

    C.     The Starkville Pride Parade Application ................................................ 4

    D.     The February 6 and February 16 Meetings ........................................... 6

    E.     The February 20 Meeting of the Starkville Board of Aldermen ........................ 6

ARGUMENT ................................................................................................................... 10

I.     Plaintiffs Are Likely to Prevail on the Merits .................................................... 11

    A.     The City's Denial of Plaintiffs' Application Violated the First Amendment. ...... 11

          1.     Viewpoint Discrimination .......................................................... 12

          2.     Content Discrimination .............................................................. 16

    B.     The City's Denial of Plaintiffs' Application Violates the Equal Protection Clause of the Fourteenth Amendment. ................................................... 17

II.    Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief. ............................... 18

III.   Plaintiffs' Injury Outweighs Any Possible Harm to Defendants. ..................................... 19

IV.   A Preliminary Injunction Is in the Public Interest. ........................................... 20

CONCLUSION ................................................................................................................ 21

## **TABLE OF AUTHORITIES**

**Page(s)**

### <u>Cases</u>

*Berner* v. *Delahanty*,
 129 F.3d 20 (1st Cir. 1997) ................................................................ 15

*Brown* v. *Entm't Merchants Ass'n*,
 564 U.S. 786 (2011) ........................................................................... 16

*Campaign for S. Equal.* v. *Bryant*,
 64 F. Supp. 3d 906 (S.D. Miss. 2014) ............................................... 20

*Campaign for S. Equal.* v. *Mississippi Dep't of Human Servs.*,
 175 F. Supp. 3d 691 (S.D. Miss. 2016) ............................................. 12

*Chiu* v. *Plano Indep. Sch. Dist.*,
 339 F.3d 273 (5th Cir. 2003) ............................................................. 11

*City of El Cenizo* v. *State of Texas*,
 264 F. Supp. 3d 744 (W.D. Tex. 2017) .............................................. 20

*Concerned Women for Am. Educ. & Legal Def. Found., Inc. (CWA)* v. *Lafayette Cty. & Oxford Pub. Library*,
 699 F. Supp. 95 (N.D. Miss. 1988) .................................................... 20

*De Leon* v. *Perry*,
 975 F. Supp. 2d 632 (W.D. Tex. 2014) .............................................. 19

*Def. Distributed* v. *United States Dep't of State*,
 838 F.3d 451 (5th Cir. 2016) ............................................................. 16

*Dept. of Agriculture* v. *Moreno*,
 413 U.S. 528 (1973) ........................................................................... 18

*Doe* v. *Marine-Lombard*,
 240 F. Supp. 3d 501 (E.D. La. 2017) ................................................. 19

*Elrod* v. *Burns*,
 427 U.S. 347 (1976) ............................................................................. 2

*Forsyth Cty., Ga.* v. *Nationalist Movement*,
 505 U.S. 123 (1992) ........................................................................... 11

*Gerlich* v. *Leath*,
 861 F.3d 697 (8th Cir. 2017) ....................................................... 12, 14

*Giovani Carandola, Ltd.* v. *Bason*,
    303 F.3d 507 (4th Cir. 2002) ......................................................................... 19

*Goldstein* v. *Allain*,
    568 F. Supp. 1377 (N.D. Miss. 1983) ........................................................... 20

*Hightower* v. *City & Cty. of San Francisco*,
    77 F. Supp. 3d 867 (N.D. Cal. 2014) ............................................................ 15

*Hous. Works, Inc.* v. *Safir*,
    No. 98-cv-4994, 1998 WL 823614 (S.D.N.Y. Nov. 25, 1998) ..................... 17

*Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*,
    515 U.S. 557 (1995) ....................................................................................... 11

*Ingebretsen ex rel. Ingebretsen* v. *Jackson Pub. Sch. Dist.*,
    88 F.3d 274 (5th Cir. 1996) .......................................................................... 20

*Int'l Women's Day Mar. Planning Comm.* v. *City of San Antonio*,
    619 F.3d 346 (5th Cir. 2010) ............................................................ 11, 12, 16

*Irish Lesbian & Gay Org.* v. *Giuliani*,
    143 F.3d 638 (2d Cir. 1998) .......................................................................... 12

*Jones* v. *Texas Dep't of Criminal Justice*,
    880 F.3d 756 (5th Cir. 2018) ........................................................................ 10

*Jones* v. *Town of Quartzsite*,
    No. 12-cv- 1383, 2014 WL 4771851 (D. Ariz. Sept. 24, 2014) ................... 14

*McMahon* v. *City of Panama City Beach*,
    180 F. Supp. 3d 1076 (N.D. Fla. 2016) ........................................................ 16

*Mobley* v. *Tarlini*,
    641 F. Supp. 2d 430 (E.D. Pa. 2009) ............................................................ 15

*Morgan* v. *Swanson*,
    659 F.3d 359 (5th Cir. 2011) ........................................................................ 12

*Opulent Life Church* v. *City of Holly Springs, Miss.*,
    697 F.3d 279 (5th Cir. 2012) ............................................................ 18, 19, 20

*Parents, Families, & Friends of Lesbians & Gays, Inc.* v. *Camdenton R-III Sch. Dist.*,
    853 F. Supp. 2d 888 (W.D. Mo. 2012) .......................................................... 15

*R.A.V.* v. *St. Paul*,
    505 U.S. 377 (1992) ....................................................................................... 12

*Reed* v. *Town of Gilbert, Ariz.*,
    135 S. Ct. 2218 (2015) ................................................................................. 1, 16

*Romer* v. *Evans*,
    517 U.S. 620 (1996) ................................................................................... 2, 18

*Rosenberger* v. *Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ............................................................................ 1, 11, 12

*Rush* v. *Nat'l Bd. of Med. Examiners*,
    268 F. Supp. 2d 673 (N.D. Tex. 2003) ........................................................ 10

*San Diego Comm. Against Registration & the Draft (Card)* v. *Governing Bd. of
Grossmont Union High Sch. Dist.*,
    790 F.2d 1471 (9th Cir. 1986) ..................................................................... 14

*Serv. Employees Int'l Union* v. *City of Houston*,
    No. 06-cv-3309, 2006 WL 3712940 (S.D. Tex. Nov. 2, 2006) ...................... 2

*Service Employees, Local 5* v. *City of Houston*,
    595 F.3d 588 (5th Cir. 2010) ....................................................................... 17

*Smith* v. *Tarrant Cty. Coll. Dist.*,
    670 F. Supp. 2d 534 (N.D. Tex. 2009) ........................................................ 19

*SmithKline Beecham Corp.* v. *Abbott Labs.*,
    740 F.3d 471 (9th Cir. 2014) ....................................................................... 18

*Sorrell* v. *IMS Health Inc.*,
    564 U.S. 552 (2011) ..................................................................................... 12

*Texans for Free Enter.* v. *Texas Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) .................................................................. 18, 19

*Turner Broadcasting System, Inc.* v. *FCC*,
    512 U.S. 622 (1994) ..................................................................................... 12

*United States* v. *Windsor*,
    570 U.S. 744 (2013) ................................................................................. 2, 18

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ..................................................................................... 18

*Waters* v. *Ricketts*,
    48 F. Supp. 3d 1271 (D. Neb.) ..................................................................... 20

## PRELIMINARY STATEMENT

This case arises from an effort by the City of Starkville to ban people from speaking in a public forum because it disagrees with their message and disapproves of their sexual orientation. In July 2017, Plaintiff Starkville Pride and two of its leaders, Plaintiffs Bailey McDaniel and Emily Turner, decided to plan a parade. They wanted to celebrate the local LGBT community and send a message in support of equality and dignity for LGBT persons. Carefully adhering to all guidelines, Plaintiffs submitted a permit application to the City of Starkville. For most people who plan parades in Starkville, this process is straightforward: in virtually every prior instance for which detailed records are publicly available (a total of 88 permit applications from 2010 to 2018), the Board of Aldermen addressed the application without public comment or deliberation through a simple yes-or-no vote. And in every single past instance, the permit application was approved. But not here. Plaintiffs' application was subjected to an irregular procedure that involved a closed-session meeting of the board, followed by public comment and deliberation among the Aldermen. Throughout this process, the *only* objections raised against Plaintiffs' permit application were anti-LGBT comments directed to the parade's LGBT content and the pro-LGBT viewpoint that the parade would express. In other words, nobody raised any concerns related to logistics, security, or cost. Nevertheless, the Board voted four-to-three to deny Plaintiffs' permit application. As a result, Plaintiffs do not have the requisite permit to hold their parade on March 24, 2018, as planned.

The Board's decision to ban speech by Starkville Pride on city streets is a textbook violation of the First Amendment. "[A] government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter, or its content.'" *Reed* v. *Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015) (citation omitted); *see also Rosenberger* v. *Rector & Visitors of Univ. of Virginia*, 515 U.S. 819,

828 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). Moreover, the Board's discriminatory treatment of Plaintiffs—based solely on animus toward LGBT persons and groups that support their equal dignity—is squarely foreclosed by the Fourteenth Amendment. *See, e.g.*, *United States* v. *Windsor*, 570 U.S. 744, 770 (2013); *Romer* v. *Evans*, 517 U.S. 620, 633 (1996).

These constitutional violations require immediate injunctive relief. The City's unconstitutional acts have caused—and are continuing to cause—irreparable injury to Plaintiffs. *See, e.g.*, *Elrod* v. *Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Serv. Employees Int'l Union* v. *City of Houston*, No. 06-cv-3309, 2006 WL 3712940, at *7 (S.D. Tex. Nov. 2, 2006) (granting preliminary injunction against ordinance violating First Amendment rights of parade organizers). In contrast, the City has not identified any legitimate reason to believe that it would suffer harm if the parade were to occur as planned. If anything, the City (and the public at large) would *benefit* from granting Plaintiffs' permit application—as the Mayor of Starkville and other community leaders have emphasized in statements responding to the Board's illegal decision. *See* Alex Holloway, *Pride Denied: Aldermen Shoot Down LGBT Parade Request*, The Dispatch (Feb. 21, 2018 9:54 AM), http://ftp.cdispatch.com/news/article.asp?aid=64025&TRID=1&TID= (last accessed Feb. 25, 2018).

Accordingly, as explained in greater detail below, the Court should grant Plaintiffs' motion for a preliminary injunction and order the City to grant Plaintiffs' permit application.

## BACKGROUND

### A.    Starkville Pride and the Planning of the Parade

Plaintiff Starkville Pride is a grassroots community organization of approximately 77 individuals who share a commitment to equality and dignity for LGBT persons. (Declaration of

Bailey McDaniel ("McDaniel Decl.") ¶7, attached hereto as Exhibit A; Declaration of Emily Turner ("Turner Decl.") ¶9, attached hereto as Exhibit B.) The organization's members communicate with one another through group email lists and the online platform GroupMe, in addition to hosting regular, in-person meetings. (McDaniel Decl. ¶7; Turner Decl. ¶9.) Plaintiffs Bailey McDaniel and Emily Turner—both lifelong Mississippians and current students at Mississippi State University—hold leadership positions within the organization. (McDaniel Decl. ¶2; Turner Decl. ¶2.) McDaniel serves as the President and Turner serves as the Public Relations Director. (McDaniel Decl. ¶6; Turner Decl. ¶8.) Both women identify as Lesbian. (McDaniel Decl. ¶4; Turner Decl. ¶6.)

In July 2017, Plaintiffs began organizing the first ever Starkville Pride parade, to be held on March 24, 2018 (the "Parade"). (McDaniel Decl. ¶10; Turner Decl. ¶10.) The purpose of the Parade was to celebrate the LGBT community and to send a message in support of equality and dignity for LGBT persons. (McDaniel Decl. ¶9; Turner Decl. ¶12.) Starkville Pride raised nearly $7,000 to put on the Parade. (McDaniel Decl. ¶8; Turner Decl. ¶11.) Plaintiffs spent considerable time and energy coordinating the Parade—and associated events—with local businesses, vendors, and community members. (McDaniel Decl. ¶13.) Plaintiffs also spent money printing promotional materials, many of which noted that the Parade would occur in Starkville on March 24, 2018. (McDaniel Decl. ¶12; Turner Decl. ¶14.)

### B.    The Starkville Special Events Application Process

In the City of Starkville, organizers of special events—including parades—are required to submit a "Special Event Application" to the City Building Department. (*See* City of Starkville, Events Policy ("Events Policy") at 12, attached as Exhibit A to Declaration of Alysson Mills (the "Mills Decl.").) Applications are reviewed by a Special Event Committee (the "Committee"), which then submits the applications to the Board of Aldermen ("The Board"). (*See* Events Policy

at 12-15.) Acting on behalf of the City, the Board has the ultimate authority to approve or deny an request. (*Id.*)[1]

The public can access records online dating to 2010 that show how the Board has handled special events applications. (*See* Mills Decl. ¶4.) Detailed records are available for a total of 88 applications from 2010 until February 2018. (*See* Mills Decl. Ex. B.) Those records indicate that 80 of those applications were considered as part of the Board's "consent agenda" or otherwise were decided through an up-or-down vote with no public comment or deliberation. (*Id.*) Indeed, only two applications prior to Starkville Pride's Application involved any public comment or deliberation at all—those applications were decided in 2011 and 2012, respectively, and the comments and deliberation were exclusively logistical in nature. (*See* Mills Decl. Exs. C, D.) Crucially, the records further indicate that every single application considered by the Board between 2010 and 2018 was approved, until Starkville Pride's. (Mills Decl. Ex. B.)

### C.    The Starkville Pride Parade Application

On behalf of Starkville Pride, Turner completed the Starkville Pride Special Events Application for the Parade. (Turner Decl. ¶16; Starkville Pride, Special Event Application (the "Application") at 3-5, attached as Appendix 1 to Turner Decl.) This submission provided a substantial amount of information. For example, it stated that the event would include an art market in addition to the Parade; that the event would be open to the public; and that the organizers expected 200 participants and 200 spectators. (Application at 3.) The Application also included a list of community sponsors and beneficiaries, as well as a list of references. (Application at 3,7.)

---

[1] The Board is subject to an anti-discrimination policy, which provides, "No person shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination in connection with a Special Event based on the grounds of . . . sexual preference. . . ." *Id.* at 23. In addition, the City's written "Events Policy" states that "[i]t is the goal of the City of Starkville to be receptive and responsive to the concept of Special Events within our city limits." *Id*. at 1.

4

The Application outlined an event that would be similar to many events that have been approved by the Board in the past. In their Application, Plaintiffs stated that their event would take place on Saturday, March 24, with the art market beginning at 8:00 am, the Parade commencing at 12:00 pm, and a teardown time of 5:00 pm. (Application at 1.) Plaintiffs requested certain street closures in connection with the Parade and estimated a total cost to the City of $3,220. (*Id*.) In all of these respects, the Application described a parade just like many others that the Board has allowed to occur. In September 2017, for example, the Board approved an application for the 2017 Starkville Community Day, hosted by "Madd Mothers Against Domestic Disputes." (Mills Decl. Ex. E.) That event also took place on a Saturday, ran from 8:00 am until 11:30 pm, required street closures for a walk (along a route similar to the route planned for the Parade), and estimated a total cost to the City of $4,677.50. (*Id*.) Similarly, in October 2016, the Board approved the Frostbite Half Marathon, which also took place on a Saturday, involved even more extensive street closures, and estimated a cost to the City of $2,750. (Mills Decl. Ex. F.)

In preparing the Application, Turner received assistance from a Starkville city official who wishes to remain anonymous out of concern for his job.[2] This individual candidly advised her and McDaniel that they should try to keep LGBT related-content on the Application "under the radar" if they wanted Board approval. (McDaniel Decl. ¶16; Turner Decl. ¶19.) This official also helped Plaintiffs ensure that the Application was completed correctly and had no defects. (McDaniel Decl. ¶16-17; Turner Decl. ¶19-20.) On January 24, Plaintiff Turner submitted the Application and accompanying documentation to the Building Department. (Turner Decl. ¶16.)

---

[2] McDaniel and Turner understand that this individual would like to remain anonymous, and prefer not to identify him by name or position—not because he did anything wrong, but in order to avoid any negative repercussions he may suffer for having helped Plaintiffs. (McDaniel Decl. ¶16; Turner Decl. ¶19.)

### D. The February 6 and February 16 Meetings

On February 6, 2018, Plaintiffs met with the Special Events Committee. (McDaniel Decl. ¶15; Turner Decl. ¶18.) At that meeting, the Committee informed Plaintiffs that their Application was proper and that the Committee was transmitting that Application to the Board. (*Id.*)

On February 16, the Board of Aldermen held a public meeting to determine which agenda items would be placed on the consent agenda at its February 20 meeting. (McDaniel Decl. ¶18; Turner Decl. ¶21.) Consistent with its virtually unbroken practice with respect to special event applications, the Board placed Starkville Pride's Application on the consent agenda. (*Id.*)

### E. The February 20 Meeting of the Starkville Board of Aldermen

When the Board met on February 20, Mayor Lynn Spruill asked the Aldermen to approve the consent agenda. (McDaniel Decl. ¶21; Turner Decl. ¶23.) In the first of several irregular developments at this meeting, Vice Mayor Roy Perkins—who also serves as an Alderman— objected. (*Id.*) As a result, Starkville Pride's Application was pulled from the consent agenda. (*Id.*) Compounding the irregularity, Alderman Sandra Sistrunk then moved for the Aldermen to excuse the public and hold a secret, closed-door "executive session." (McDaniel Decl. ¶22; Turner Decl. ¶24.) Plaintiffs and other community members were required to leave the room and wait outside for approximately ten minutes. (*Id.*) When the public was invited back into the meeting, the Mayor stated that no formal action had been taken during the executive session (Feb. 20, 2018 Board of Aldermen Meeting Transcript (the "Transcript"), at 1, attached as Exhibit G to the Mills Decl.)[3] It is obviously unclear what informal decisions might have been reached.

After addressing several unrelated issues, the Board invited members of the community to make public comments concerning the Application. McDaniel told the Aldermen that it is "time

---

[3] Plaintiffs retained a transcription vendor to prepare a written transcript of the meeting based on a video posted to the City of Starkville's Facebook page. *See* Mills Decl. ¶9.

for Starkville to recognize the [LGBT] community," and that Starkville Pride is going to be a "wonderful celebration of community, inclusion and diversity for years to come." (Transcript at 12.) When she spoke, Turner noted economic and other respects in which the Parade would benefit the community. (*Id*. at 15.) She also emphasized that the Parade would express an important message: "Starkville is an inclusive place, which I know it is." (*Id*. at 15.) In addition to these remarks from McDaniel and Turner, thirteen other individuals—including students, business owners, and state officials—spoke in support of the parade. (*Id*. at 12-25.) Their comments demonstrate that the Parade was understood as an expressive event, and that many people in Starkville believed it would confer substantial benefits on their community. As these men and women explained why the Application should be approved, the four Aldermen who would subsequently vote against the Application remained silent and pointedly avoided eye contact with them. (McDaniel Decl. ¶24; Turner Decl. ¶26.)

Only two people spoke in opposition to the Parade—and both of them voiced objections based solely on the content and viewpoint of the message to be expressed by the Parade. The first objector was Dorothy Isaac. Ms. Isaac told the Board, "if anything [is] to be hailed up and down our street, it should not be this. God made Adam and Eve." (Transcript at 20.) She then appealed to the Aldermen, "[P]lease do not turn our city into a city of sin . . . I really, really will hope y'all will put this down quickly." (*Id.*) These remarks were consistent with a conversation between Ms. Isaac and the Vice Mayor (and Aldermen) just before the meeting began, in which the Vice Mayor said to Ms. Isaac, "thank you for being here, I know you know the true issues." (McDaniel Decl. ¶19.)

The second person to speak against the Parade was Pastor Thomas Rogers. He said that Starkville is a "very friendly city, very friendly county and we have done a lot of things to adjust

7

for the university . . . [b]ut every city has to have a limit or limits and cities without walls are easily taken. . . .do what is true and act[] against the Pride march or Pride parade." (Transcript at 21-22.)

As a review of the transcript reveals, neither Ms. Isaac nor Pastor Rogers voiced any logistical, security-related, financial, or other objection to the Parade. (*Id.* at 20-22.) Nor did they state that the Application was flawed under the City's permit requirements. (*Id.*) In fact, no one at the meeting raised any concern along these lines. (*See* McDaniel Decl. ¶27; Turner Decl. ¶28.)

Following public comments, the Vice Mayor made a motion to deny the Application. (Transcript at 49.) Alderman Carver seconded the motion. (*Id.*) In response, Alderman Walker requested confirmation that the Application had been completed in full, was free of defects or errors, and met all applicable requirements. (*Id.* at 49-50.) A Community Development official confirmed each of these points, and no Aldermen indicated any disagreement. (*Id.* at 49-50.) Alderman Walker then asked the Community Development official whether a proper application, like this one, had *ever* been denied. (*Id.* at 49.) The Community Development official responded that he had been there since 2014 and had "not seen anything like that." (*Id.*)

The Mayor then said that she had spoken to the Mayor of Oxford, Mississippi, who reported that Oxford had held a pride parade that had been "no different or separate from any other parade they have had." (*Id.* at 50.) The Mayor said that she hoped that the Board would approve the Application and authorize the Parade, which she did not "expect to be anything other than what any other parade is in town, which is an opportunity for people to come downtown and be a part of a group." (*Id.*) In the same vein, Alderman Miller encouraged the Board to consider the public relations and economic implications of denying the Application. (*Id.* at 50-51.) Alderman Miller also spoke directly to community members who had made comments concerning the Application, telling them, "you're all welcome in Starkville" and "you are important to Starkville." (*Id.* at 51.)

Again, at no point during this discussion did any Aldermen raise any logistical, security-related, financial, or other concern relating to the Parade. (*Id.* at 49-52.) Indeed, none of the Aldermen who ultimately voted against the Application uttered a single word during this discussion. (*Id.*) Following this exchange, Aldermen Carver, Little, and Vaughn, and Vice Mayor Perkins each voted to grant the Vice Mayor's motion to deny the Application. (*Id.* at 51-52.) By a vote of four to three, the motion to deny the Application passed. (*Id.* at 52.) McDaniel burst into tears. (McDaniel Decl. ¶28.) The four Aldermen who voted to deny the Application promptly left the room through a private back entrance. *See* Alex Holloway, *Pride Denied: Aldermen Shoot Down LGBT Parade Request*, The Dispatch (Feb. 21, 2018 9:54 AM), http://ftp.cdispatch.com/news/article.asp?aid=64025&TRID=1&TID= (last accessed Feb. 25, 2018).

McDaniel and Turner were deeply hurt by the Board's unexpected decision to forbid the Parade. They had worked hard to plan a celebration that sent the message of equal dignity to LGBT residents—and suddenly their plans had been rejected, indeed censored, by leaders of the community they call home. (Transcript at 52; McDaniel Decl. ¶30; Turner Decl. ¶31.) In addition, McDaniel and Turner felt ashamed and stigmatized. They had been singled out for unfavorable treatment because they identify as lesbians and because the organization they led was associated the LGBT community. (McDaniel Decl. ¶31; Turner Decl. ¶32.) Recognizing McDaniel's visible pain, Mayor Spruill turned to McDaniel and said, "I am so sorry." (McDaniel Decl. ¶28.)

In the days following the vote, former Alderman Lisa Wynn used Twitter to thank the four Aldermen who voted against the Application for "saying NAY…NO PARADE!" (Tweets of Lisa Wynn ("Wynn Tweets"), attached as Exhibit H to Mills Decl.) Ms. Wynn added, "I warned my friends this would occur under LESBIAN leadership." (*Id.*) The next day, Ms. Wynn tweeted

again. This time she took credit for identifying LGBT-related content in the Application, and for successfully lobbying the Board to suppress that content: "I tipped the Aldermen off about the language…PRIDE. Secured the 4 votes this weekend. I'm still working it." (*Id.*)

As of the date of this filing (other than the tweets discussed above by a former Alderman), none of the four current Aldermen who voted to deny the Application has publicly offered any explanation or justification for his or her vote.[4]

## ARGUMENT

Plaintiffs seeking a preliminary injunction must establish: "(1) a substantial likelihood that [they] will prevail on the merits, (2) a substantial threat that [they] will suffer irreparable injury if the injunction is not granted, (3) [their] substantial injury outweighs the threatened harm to the party whom [they] seek to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Jones* v. *Texas Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (citation omitted). In addition, in order to obtain an injunction that alters the status quo—also known as a "mandatory injunction"—plaintiffs must to show that "the facts and law clearly favor [their request]." *Rush* v. *Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003).

These requirements are more than satisfied here. The City banned Plaintiffs from speaking in a public forum solely because it disagreed with the viewpoint and content of their speech. That hostility to their message was inextricably intertwined with hostility to their LGBT identity and pro-LGBT advocacy. Accordingly, the City's decision to deny Plaintiffs' permit application violated both the First Amendment and the Equal Protection Clause. Without swift action by this

---

[4] Aldermen Ben Carver was quoted in the press as saying, "I was elected to represent the constituents and the majority of the constituents from my ward have been supportive of this," but declined to provide any substantive explanation or justification for his vote. *See* Jeff Amy, *Gay parade permit sparks major debate in Mississippi*, ABC News, http://abcnews.go.com/US/wireStory/gay-parade-permit-sparks-major-debate-mississippi-53331097 (last accessed Feb. 25, 2018).

Court, Plaintiffs will continue to suffer irreparable injury: the loss of their right to engage in political speech and the ongoing stigma caused by suffering discrimination on the basis of sexual orientation. Given the total absence of any legitimate justification for the City's act of censorship— and given the substantial public benefits that would accrue to the City from allowing the Parade to occur—there can be no doubt that preliminary injunctive relief is warranted in this case.

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.    The City's Denial of Plaintiffs' Application Violated the First Amendment.

Plaintiffs organized the Parade to express a profound and personally meaningful message on issues of undoubted political, cultural, and social importance. *See Hurley* v. *Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) (holding that parades are generally "expressive" in character); *see also Int'l Women's Day Mar. Planning Comm.* v. *City of San Antonio*, 619 F.3d 346, 354 (5th Cir. 2010) (same). In denying Plaintiffs' permit application, the City effectively banned them from expressing that message. This case thus evokes the core target of the First Amendment: an exercise of the state's censorial power to impose prior restraints on protected speech in a public forum. *See Forsyth Cty., Ga.* v. *Nationalist Movement*, 505 U.S. 123, 130 (1992). Although cities may require parade organizers to obtain advance permission, the First Amendment strictly limits the grounds on which they can deny permits. *See id.* at 130-32. Chief among those restrictions is a categorical bar on efforts to "'regulate speech based on its substantive content or the message it conveys.'" *Chiu* v. *Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003) (quoting *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (2005)). Cities may not use their permit power to silence messages (or messengers) that they would prefer to banish from the marketplace of ideas.

11

Here, the record is consistent with only one conclusion:  that the City denied a permit because the Parade would address LGBT issues and send a message in support of equality and dignity for LGBT persons. Put differently, the City silenced Plaintiffs because it objected to the viewpoint and content of their speech. In doing so, the City violated the First Amendment.[5]

### 1.   Viewpoint Discrimination

"Discrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828 (citing *Turner Broadcasting System, Inc.* v. *FCC*, 512 U.S. 622, 641-43 (1994)). "When the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829 (citing *R.A.V.* v. *St. Paul*, 505 U.S. 377, 391 (1992)). For that reason, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.* Indeed, because viewpoint discrimination "strikes at the very heart of the First Amendment," *Morgan* v. *Swanson,* 659 F.3d 359, 401 (5th Cir. 2011) (en banc) (quoting *Morse* v. *Frederick*, 551 U.S. 393, 423 (2007) (Alito, J., concurring)), viewpoint-based burdens on speech automatically qualify as unconstitutional. *See Int'l Women's Day*, 619 F.3d at 359; *see also Sorrell* v. *IMS Health Inc.*, 564 U.S. 552, 571 (2011). In assessing whether the government has suppressed speech on the basis of its viewpoint, courts consider the full circumstances of the relevant governmental decision. *See, e.g.*, *Gerlich* v. *Leath*, 861 F.3d 697, 705 (8th Cir. 2017).

---

[5] Starkville Pride has standing to sue on its own behalf as an organization for the denial of its First Amendment rights.  *See Irish Lesbian & Gay Org.* v. *Giuliani*, 143 F.3d 638, 649-50 (2d Cir. 1998); *c.f. also Campaign for S. Equal.* v. *Mississippi Dep't of Human Servs.*, 175 F. Supp. 3d 691, 707-08 (S.D. Miss. 2016) (finding that the organizational plaintiff had standing to sue on behalf of its members).

The record is clear that the City of Starkville denied Plaintiffs' Application on the basis of its pro-LGBT viewpoint. Five considerations compel that conclusion here.

*First*, at the February 20 Board meeting, the only objections raised against the Parade were based explicitly—and solely—on its pro-LGBT viewpoint. Ms. Isaac emphasized that "God made Adam and Eve," and said that permitting the Parade would "turn our city into a city of sin." (Transcript at 20; McDaniel Decl. ¶¶20, 25.) Pastor Rogers emphasized that there should be a "limit" on the extent to which the City would "adjust for the university," and asked the Board to "act [] against the Pride march." (Transcript at 22; *see also* McDaniel Decl. ¶24.) And Vice Mayor Perkins associated himself with these sentiments when he quietly thanked Ms. Isaac for participating and said, "I know you know the true issues." (McDaniel Decl. ¶20.)

*Second*, while the record *does* contain explicit demands for viewpoint and content discrimination, it *does not* contain any other justification (much less a plausible one) for the Board's decision. To start, there is no dispute that the Application was complete, free of errors, and consistent with all other criteria ordinarily applied to parade permit applications. (McDaniel Decl. ¶¶15-17; Turner Decl. ¶¶18-20.) More important, nobody who voted against (or otherwise opposed) the Application raised any logistical, security-related, or financial objection to the Parade. (*See* Transcript at 1-52.) In fact, the Mayor affirmatively dispelled any such concerns, noting that she believed the Parade would be a success, and would be "no different or separate from [] any other parade." (*Id*. at 50.) The Mayor also observed that the City of Oxford had held similar parades without incident and there was no reason to believe Starkville would be any different. (*Id*.) Alderman Miller added that the Parade would be "an event just like any other event that we allow in this community" and emphasized the economic impact that *not* approving the request could have on the city. (*Id*.) As a matter of precedent and common sense, this glaring

13

absence of any legitimate basis for denying the Application is strong evidence of viewpoint discrimination. *See San Diego Comm. Against Registration & the Draft (Card)* v. *Governing Bd. of Grossmont Union High Sch. Dist.*, 790 F.2d 1471, 1481 (9th Cir. 1986) (lack of a "valid reason" for differential treatment meant that "only reasonable inference is that the Board was engaging in viewpoint discrimination," and remanding for entry of a preliminary injunction).

*Third*, former Alderman Lisa Wynn issued a series of tweets after the Board meeting suggesting that she had discussed the Application with the four Aldermen who cast the decisive votes. In these tweets, Ms. Wynn directly attacked "LESBIAN leadership," and claimed credit for having "tipped the Aldermen off about the language . . . PRIDE. Secured the 4 votes this weekend." (*See* Wynn Tweets.) These comments indicate that Ms. Wynn alerted those Aldermen to the pro-LGBT viewpoint that the Parade would express and successfully urged them to oppose it on that basis. This evidence is fully consistent with the statements made (and not made) at the Board meeting itself, and with the Board's ultimate decision to censor Plaintiffs' pro-LGBT message.

*Fourth*, Plaintiffs' Application was treated very differently than most applications for special event permits. Of the 88 applications for which detailed records are publicly available, 80 were addressed without public comment or deliberation through an up-or-down vote. (Mills Decl. Ex. B.)[6] Here, however, the City departed from that consistent practice and instead subjected Plaintiffs' Application to a more exacting process. This difference in process is strong evidence of viewpoint bias. *See Gerlich*, 861 F.3d at 705 (identifying "unique scrutiny" as evidence of viewpoint discrimination); *see also Jones* v. *Town of Quartzsite*, No. 12-cv-01383, 2014 WL 4771851, at *4 (D. Ariz. Sept. 24, 2014) (finding that "invocation of an unspecified procedural

---

[6] Of the eight instances that involved public comment or deliberation, only two (in 2011 and 2012 respectively) involved any substantive public comment or deliberation, and the public comment and deliberation was entirely logistical in nature. (*See* Mills Decl. Exs. C, D.)

rule" at a town council meeting to burden particular speaker permitted the court to "infer[] . . . viewpoint discrimination"). So, too, is the simple fact that Plaintiffs' application was denied. Between 2010 and the February 20 meeting, according to the records that are available to the public, the Board approved 87 special event applications and denied zero. Indeed, at the February 20 meeting, Alderman Walker asked whether the Board had ever denied a proper special event application, and a Community Development official said that he had "not seen anything like that." (Transcript at 49.) *See Parents, Families, & Friends of Lesbians & Gays, Inc.* v. *Camdenton R-III Sch. Dist.*, 853 F. Supp. 2d 888, 892 (W.D. Mo. 2012) (finding viewpoint discrimination where LGBT groups were treated differently than other groups).

*Finally*, as explained above, the Board has recently approved permits for other parades and events of similar size and scope. There was nothing about Plaintiffs' request for a permit that raised new or unusual questions about authorizing parades in Starkville. This sharp difference in treatment between Plaintiffs and other speakers who proposed similar events is strong evidence of viewpoint discrimination. *See Hightower* v. *City & Cty. of San Francisco*, 77 F. Supp. 3d 867, 883-84 (N.D. Cal. 2014) (upholding viewpoint discrimination claim where city denied a parade permit and explaining that "intentionally discriminatory government action" may be assessed by reference to treatment of similarly situated applicants), *aff'd sub nom. Taub* v. *City & Cty. of San Francisco*, 696 F. App'x 181 (9th Cir. 2017); *see also Berner* v. *Delahanty*, 129 F.3d 20, 28 (1st Cir. 1997) (holding that "viewpoint discrimination sometimes can be [inferred] when the proscribed speech and the permitted speech are alike in ways that undermine the justification asserted in support of the restriction"); *Mobley* v. *Tarlini*, 641 F. Supp. 2d 430, 441 (E.D. Pa. 2009).

In sum, the City denied Plaintiffs' application at a meeting where the only objections involved their viewpoint; where nobody raised (and some people affirmatively dispelled) other reasons to deny the permit; where the four key votes had already discussed their desire to suppress pro-LGBT speech with a former Alderman; where irregular procedures were unexpectedly used; where a permit was denied for the first time in years; and where no distinction was drawn between Plaintiffs' application and similar applications that the Board had recently approved. This record overwhelmingly shows that the City denied Plaintiffs' application on the basis of the pro-LGBT viewpoint that the Parade would express. And that is a clear violation of the First Amendment.[7]

### 2. Content Discrimination

Unlike viewpoint discrimination, which requires a burden on a particular viewpoint, content discrimination occurs when the government more generally seeks to silence speech on "specific subject matter." *Def. Distributed* v. *United States Dep't of State*, 838 F.3d 451, 468 (5th Cir. 2016); *see also Reed* v. *Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2230 (2015) ("'[T]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" (citation omitted)). Governmental action that discriminates against speech based on its content is subject to strict scrutiny. *See id.* at 2226; *see also Int'l Women's Day,* 619 F.3d at 359 ("[C]ontent-based burdens on speech in a public forum are subject to strict scrutiny."). "It is rare that a regulation restricting speech because of its content will ever be permissible." *Brown* v. *Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011). As with viewpoint discrimination, content discrimination may be inferred

---

[7] At this point, a post-hoc rationalization would be insufficient as a matter of law to save the City's unconstitutional permit denial. *See McMahon* v. *City of Panama City Beach*, 180 F. Supp. 3d 1076, 1109 (N.D. Fla. 2016) ("[A] government cannot generally put forth after-the-fact evidence of a purportedly viewpoint-neutral policy, as this could lead to post-hoc rationalizations for viewpoint discrimination." (citation omitted)).

from circumstantial evidence. *See, e.g.*, *Hous. Works, Inc.* v. *Safir*, No. 98-cv-4994, 1998 WL 823614, at *8-9 (S.D.N.Y. Nov. 25, 1998).

Here, the evidence that the City suppressed Plaintiffs' speech because of its pro-LGBT viewpoint also supports a finding that the City suppressed Plaintiffs' speech because the Aldermen opposed allowing *any* parade involving an LGBT-related message. This conclusion draws added support from the fact that Plaintiffs were warned by a city official that their application should keep all LGBT-related content "under the radar" if they wanted it to be approved. (McDaniel Decl. ¶16; Turner Decl. ¶19.) This comment strongly suggests that city insiders knew that the Board did not approve of speech on this subject and would seek to censor such expression.

Because the Board engaged in content discrimination, its decision to deny the Application cannot stand unless it survives strict scrutiny. But at its meeting—and since then—the Board has failed to identify *any* interest whatsoever that its decision advances. And even if the City could now manufacture a justification for its decision, it is difficult to imagine a legitimate explanation that coheres with the record and supports a blanket ban on Plaintiffs' right to speak. *See Service Employees Intern. Union, Local 5* v. *City of Houston*, 595 F.3d 588 (5th Cir. 2010) (noting that states are "sharply circumscribed" in their right to restrain expression in places which have long been "devoted to assembly and debate," including "streets and parks" (quoting *Perry Educ. Ass'n* v. *Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983))). In any event, the Mayor and Aldermen Miller have already made clear that holding the Parade is actually in the City's best interest. Accordingly, there can be no doubt that the City has violated Plaintiffs' First Amendment rights.

### B. The City's Denial of Plaintiffs' Application Violates the Equal Protection Clause of the Fourteenth Amendment.

Under the Equal Protection Clause, the Supreme Court has made clear that governmental acts based solely on animus against LGBT individuals are constitutionally impermissible. *See,*

*e.g.*, *United States* v. *Windsor*, 570 U.S. 744, 775 (2013); *Romer* v. *Evans*, 517 U.S. 620, 632-35 (1996). In addition, the Supreme Court has applied a heightened level of scrutiny to laws discriminating on the basis of sexual orientation. *See, e.g.*, *Windsor*, 570 U.S. at 775; *see also SmithKline Beecham Corp.* v. *Abbott Labs.*, 740 F.3d 471, 481 (9th Cir. 2014).

Here, for all the reasons set forth above, it is clear that the Board of Aldermen denied Plaintiffs' Application because Turner and McDaniel identify as lesbians and Plaintiff Starkville Pride is explicitly associated with the LGBT community. The City has not offered—and, again, the Mayor and Alderman Miller have expressly disclaimed—any legitimate basis for banning LGBT people (and a pro-LGBT advocacy group) from holding a parade on city streets.[8]

Accordingly, Plaintiffs in this action are likely to prevail on their claim that the denial of their Application violated their Fourteenth Amendment right to the equal protection of the law.

## II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT PRELIMINARY RELIEF.

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church* v. *City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (citation omitted). That is especially true of First Amendment deprivations: "[t]he loss of First Amendment freedoms for even minimal periods of time constitutes irreparable injury justifying the grant of a preliminary injunction." *Texans for Free Enter.* v. *Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). In other words, the First Amendment does not confer a right to speak *eventually*, or *somewhere else*, or *with different*

---

[8] In assessing whether a governmental actor based a decision on animus, courts consider the same circumstantial and objective factors employed above to discern why the Board denied Plaintiffs' permit application. *See Windsor*, 570 U.S. at 770-74; *Romer*, 517 U.S. at 634-35; *Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-67 (1977); *Dept. of Agriculture* v. *Moreno*, 413 U.S. 528, 536-38 (1973).

*groups of people.* Where plaintiffs establish a right to speak at a particular time and place—*e.g.*, a public forum on March 24, 2018—the loss of that right constitutes injury that cannot be undone.

Here, Plaintiffs will suffer irreparable harm absent preliminary relief. As a matter of law, the ongoing violation of their First Amendment rights automatically qualifies as irreparable injury. *See Texans for Free Enter.*, 732 F.3d at 539. So, too, does the ongoing violation of their Fourteenth Amendment rights. *See De Leon* v. *Perry*, 975 F. Supp. 2d 632, 664 (W.D. Tex. 2014).

## III. PLAINTIFFS' INJURY OUTWEIGHS ANY POSSIBLE HARM TO DEFENDANTS.

Where, as here, state action violates constitutional rights, the state must present "powerful evidence of harm to its interest" to avoid a preliminary injunction. *Opulent Life Church*, 697 F.3d at 297. The City cannot meet that standard. As noted above, the City has not offered any legitimate basis for its denial of Plaintiffs' Application, and the Mayor and Alderman Miller have affirmatively dispelled a range of potential justifications. (*See supra* pp. 13-14.) In addition, the Mayor noted that successful pride parades were held in Oxford, Mississippi without incident. *See Smith* v. *Tarrant Cty. Coll. Dist.*, 670 F. Supp. 2d 534, 539 (N.D. Tex. 2009) (granting a temporary restraining order on First Amendment grounds and finding that the existence of "similar demonstrations" elsewhere supported emergency relief). Indeed, the City is "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd.* v. *Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted).

Plaintiffs, on the other hand, have suffered and will continue to suffer serious constitutional injuries that far outweigh any potential harm the City might purport to claim. *See Doe* v. *Marine-Lombard,* 240 F. Supp. 3d 501, 522 (E.D. La. 2017) (denial of "First Amendment Freedoms" outweighed harm to state); *De Leon*, 975 F. Supp. 2d at 664 (injury to rights guaranteed by the

Equal Protection Clause outweighed damages to city); *see also City of El Cenizo* v. *State of Texas*, 264 F. Supp. 3d 744, 811 (W.D. Tex. 2017) ("[T]he protection of constitutional rights is paramount.").

## IV.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

It is well-settled that "the public has a vital interest in the vigorous exercise of First Amendment Rights." *Goldstein* v. *Allain*, 568 F. Supp. 1377, 1387 (N.D. Miss. 1983); *see also Ingebretsen ex rel. Ingebretsen* v. *Jackson Pub. Sch. Dist.,* 88 F.3d 274, 280 (5th Cir. 1996) (finding "the public interest was not disserved by an injunction preventing . . . implementation" of a law violating the First Amendment); *Concerned Women for Am. Educ. & Legal Def. Found., Inc. (CWA)* v. *Lafayette Cty. & Oxford Pub. Library*, 699 F. Supp. 95, 98 (N.D. Miss. 1988) ("Moreover, an injunction would serve the public interest by insuring unfettered exercise of speech in a public forum."), *aff'd sub nom. Concerned Women for Am. Inc.* v. *Lafayette Cty.*, 883 F.2d 32 (5th Cir. 1989). Indeed, the Fifth Circuit has recognized that "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (citation omitted).

Similarly, Courts have repeatedly recognized that injunctions vindicating equal protection rights are in the public interest. *See Campaign for S. Equal.* v. *Bryant,* 64 F. Supp. 3d 906, 952 (S.D. Miss. 2014) (finding public interest would be harmed by enforcement of laws prohibiting same-sex marriage), *aff'd*, 791 F.3d 625 (5th Cir. 2015); *see also Waters* v. *Ricketts,* 48 F. Supp. 3d 1271, 1290 (D. Neb.) ("[I]t is in the public's best interest to vindicate the plaintiffs' constitutional rights and enjoin the State's enforcement of its discriminatory marriage laws."), *aff'd,* 798 F.3d 682 (8th Cir. 2015).

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that this Court grant their Motion for a Preliminary Injunction. In addition, Plaintiffs request that this Motion be considered and decided as expeditiously as possible, given that the Parade was planned for March 24, and Plaintiffs need additional time to organize, plan, and promote the event.

Dated:  February 26, 2018                   Respectfully submitted,

/s/ Alysson Mills
Alysson Mills, MS Bar No. 102861
Kristen D. Amond, LA Bar No. 37011
FISHMAN HAYGOOD LLP
201 St. Charles Ave., 46th Floor
New Orleans, LA  70170
(504) 586-5253

Roberta A. Kaplan (*pro hac vice pending*)
John C. Quinn (*pro hac vice pending*)
Joshua Matz (*pro hac vice pending*)
KAPLAN & COMPANY, LLP
350 Fifth Ave, Suite 7110
New York, NY  10118
(212) 763-0883

*Attorneys for Plaintiffs*